## Minnie Kapella, Appellee, v. Chicago Railways Company et al., Appellants.

### Gen. No. 27,280.

1. CARRIERS—*sufficiency of evidence of negligence of carrier.* A verdict in favor of plaintiff will not be reversed as against the weight of evidence, although four witnesses for defendants testified that plaintiff fell after she alighted from the defendants' street car and not as she was alighting from it and only the plaintiff and one witness testified that her fall occurred as she was alighting and was caused by the sudden starting of the car, where such witness saw the whole occurrence and his testimony is consistent with the nature and location of plaintiff's injuries and the testimony of defendants' witnesses is inconsistent with the injuries and the physical facts and contains discrepancies.

2. CARRIERS—*excessiveness of damages for hernia resulting from passenger's fall.* A verdict of $2,125 for an oblique inguinal hernia and minor superficial bruises suffered by plaintiff resulting from a fall from defendants' street car, caused by the sudden starting of the car as plaintiff was alighting therefrom, is not excessive where it appears that she was under medical care for weeks and that she is incapacitated from further work of the kind she was engaged in at the time of the fall and which furnished her livelihood.

THOMSON, P. J., dissenting.

Appeal by defendants from the Circuit Court of Cook county; the Hon. DONALD L. MORRILL, Judge, presiding. Heard in the Branch Appellate Court at the October term, 1921. Affirmed. Opinion filed April 11, 1923. Rehearing denied April 24, 1923. *Certiorari* denied by Supreme Court (making opinion final).

HARRY P. WEBER, GEORGE W. MILLER, ARTHUR J. DONOVAN and ARTHUR A. ANDERSON, for appellants; JOHN R. GUILLIAMS and FRANKLIN B. HUSSEY, of counsel.

HUGH R. PORTER and CHARLES C. SPENCER, for appellee.

MR. JUSTICE TAYLOR delivered the opinion of the court.

By this appeal the defendants, Chicago Railways Company and others, seek to reverse a judgment for $2,125 recovered against them by the plaintiff, Minnie Kapella, in the circuit court of Cook county, said judgment being based upon the verdict of a jury finding the issues for the plaintiff and assessing her damages at the amount above named.

On the evening of March 20, 1919, the plaintiff was a passenger on a street car operated by the defendants, which car was proceeding in a southerly direction along Racine avenue in the City of Chicago. The plaintiff indicated to the conductor that she wished to leave the car at the intersection of Racine avenue and 50th street, and the car stopped at the north side of 50th street for the purpose of permitting her to alight.

It is the theory of the plaintiff that as she was getting off the car started up and caused her to fall, inflicting the injuries which form the basis of this action. It is the theory of the defendants that she did not fall as she was getting off the car but after she had entirely left it and that her fall was not occasioned in any way by the movements of the car.

The plaintiff lived at 4954 South Racine avenue, which is the second door north of the northwest corner of Racine avenue and 50th street. She was thirty-seven years and nine months old at the time in question; she then weighed about 208 pounds and was about five feet eight inches tall, and had always been, according to her testimony, healthy and strong. She was a married woman and had eight children. For several years up to March 8, 1919, she had been working in various departments in the stockyards and had earned from $18 to $30 a week. Her work was eight hours night work, part of it being the handling of twelve pound cans of bacon, carrying them from one table to another.

As to the occurrence in question, she testified that when the car got to 49th street she left her seat and

went to the door and said to the conductor, "50th place"; that shortly thereafter the conductor gave the signal to stop; that she stood in the car, in the doorway, and as the car slowed down and came to a standstill she stepped out on the platform and was there when the car stopped; that then, at once, she took hold of the rail, which was on the body of the car, with her left hand, placed her right foot on the lower step, and was in the act of putting her left foot down towards the ground when the car started and, her hand being loosened from the rail of the car, she fell. When asked how the car started, she said, "Well, kind of quick, not too quick, but how they mostly start." She further stated that when she fell she fell on her right side; that she was facing more towards the west than the way in which the car was going.

The injury which she first noticed, according to her testimony, was in her ankle, and gave her much pain during the night of the injury. She testified also that she felt pain in her whole right leg and side and her chest. Her right ankle became badly swollen and discolored and there was also some discoloration in her right knee and her right elbow. The morning after the injury she called in a doctor and he bandaged her right ankle and gave her some salve for her bruises. She kept complaining of the pains in her side and on the second day after the injury the doctor discovered a hernia. She testified that she had never had anything of that kind prior to that time.

Dr. Belsan, surgeon to St. Bernard's Hospital and of the Illinois Central Hospital, testified that he had attended the plaintiff and her family as a physician; that he was called by her after she had the fall in question; that he examined her and found "multiple contusions of her right limbs—that is her right leg, her right arm and then a few bruises on her back"; that she complained of some pains in the inguinal region, in the right groin; that there were contusions of

the tibia and on the anterior part of the thigh and of the ankle of the right leg; that he treated her for three or four months. He further testified that he remembered a few blue spots on the back, also, that "the bruises on the limb and on the back they got along very nicely, they were simply a little bruise underneath the skin." He further testified that in three or four days he noticed a small hernia on the right side; that he kept her in bed for several weeks; that after she got up the hernia got much larger, and pursuant to his advice she got a truss; that the hernia is so large that the truss which she got shortly prior to the trial, pursuant to his instructions, does not hold the viscera in; that in his judgment such a hernia incapacitates one from doing any heavy work, lifting or being on one's feet a great deal.

The only occurrence witness who testified for the plaintiff was one Charles Koslowski, who had lived for about four years with his father, a laborer, at 4948 South Racine avenue, a couple of doors, as he said, north of where the plaintiff lived, that is number 4954. He was nineteen years and twenty days old at the time of the plaintiff's injury. He had worked for Armour's for five years. He knew the plaintiff but only to the extent of knowing who she was. He testified that when he got to the front door of his home, the night in question, he saw a southbound street car stopped at the corner; that a woman was just about to get off the car, and as she was about to get off the car moved and she was thrown to the ground; that the car kept going and stopped at the other corner; that a young man, who was at the corner, picked her up and a policeman in uniform, and the conductor, and a man in civilian clothes, got off the car and went back and picked her up; that he was about thirty or forty feet away at the time she fell. He says that when the car stopped it was across 50th street. On cross-examination he testified that the front end of

the car when it first stopped was about one foot north of 50th street; that he could see all along the west side of the car and that no one got off the front end; that he saw a large woman who, he found out afterwards was the plaintiff, get off the rear end; that the car came to a standstill; that she stepped down a couple of seconds after the car stopped; that she took hold of both railings, the one on the south end of the car and the middle one that goes to the roof, and faced west; that she was just partly off and partly on, the right foot partly on the ground and partly in the air, and was just about to get off when the car moved, and she fell on her right side, on her elbows and knees.

Four occurrence witnesses were called for the defendants. One Kolin, a shoe salesman, twenty-two years old, testified that he was riding on the rear platform and when the car came to a stop, a large woman got off and started to walk towards the west sidewalk; that after the car had gone about a car's length it stopped again and he turned and saw that she had fallen down, about four feet from the curbstone, with her hands and knees down, forwards, towards the west, her hands being on the curbstone; that he, the conductor and a policeman got off and helped her up; that the last he saw of her she was walking into a yard.

On cross-examination he testified that she was about three or four or five or six feet away when the car started; that he did not see her fall; that when the conductor gave the bell to go ahead, she had walked five or six feet away; that when he looked after the car had stopped, being then wholly in the intersection, she was on her hands and knees, her hands resting on the curb, her face about a foot or two from the ground; that it was a dirt road and contained ruts.

One DeCramer, a workman at the stockyards, and an associate of Kolin, twenty-three years old, testified that he was standing on the back platform with Kolin,

a policeman, and the conductor; that he saw the plaintiff come out of the car onto the platform and wait until the car stopped; that when she stepped down on the street and started walking west, towards the sidewalk, the car was standing still; that the next thing he knew the conductor stopped the car; that he got off and saw her down on her hands and knees in a stooping position, facing west, about two feet from the curbstone. He says that he saw her walk away from the street car—he imagines a step or two—but says he did not actually see her get down, and that there was no fall in getting off the car or anything of that kind. On cross-examination he testified that he saw her go down and walk away from the car; that when the car started up, she proceeded towards the curb and was then just off the step, about a couple of steps away from the step; that he imagined the distance from the car to the curb was about ten or twelve feet; that when the car stopped the second time it had moved about half a car length; that then he turned and saw her stooping down on her hands and knees, about six or eight feet from the car track, and about two or three feet from the curb; that he really did not see her fall; that it was a dirt street.

One Stadfield, a police officer, testified that he was standing alongside the controller, with two passengers and the conductor; that he was facing west; that when the car stopped, the plaintiff stepped off and the car started to move; that it was standing perfectly still when she stepped off; that after she alighted she faced west and took a couple of steps, clear of the car, towards the curb; that when the car started she was about three steps away from the car steps; that she fell face forward on her knees, on all fours; that he jumped off before the car again stopped and went back and with the conductor helped her up; that he asked her if she was injured, and she said no. And when asked to tell what he saw, said: "Well, she fell

face forward, not knowing what caused her to fall.''
He further stated that she fell straight forward on her
hands and knees and that no other part of her body
touched the ground. He reiterates that she was about
three steps away from the car, about forty-two inches,
and says that her hands were not on the curb. He
says he had no conversation with her save to ask her
if she was injured; that he knew that street for twen-
ty-five to thirty years and that he found no evidence
at all of it being in such a condition as would make the
city liable for a fall.

The motorman, Haas, testified that he stopped the
car at 50th street; that it was about 11:07 p. m.; that
he opened the door and let off two men; that he got
a bell to go ahead before they got off, but waited till
they were off; that then, after he had gone nine or
ten feet, he got a bell to stop, and after the car had
gone a total of nineteen or twenty feet and was about
in the middle of the intersection, it was again stopped.
He says the first stop occupied about ten or eleven
seconds, also, that he looked back and saw the con-
ductor standing at the curbstone talking to a lady.
On cross-examination he said that the two passengers
in front were standing there ready to get off, when he
stopped at 50th street, but that he did not open the
door until the car was at a dead stop.

One Shaddon, the conductor, testified that when the
car was at 49th place the plaintiff asked him to stop
at 50th street; that she stood on the platform until
the car reached that street; that after the car stopped
she stepped off on to the street safely and walked to-
wards the curb; that after she had taken two or three
steps from the car, he rang the bell to go ahead; that
he did not see her fall; that his attention was called
to it by the officer; that he then looked and saw her
on her hands and knees near the curb, her hands rest-
ing on the curb and herself facing west; that the car
had gone about six or eight feet when he pulled the

Kapella v. Chicago Railways Co., 228 Ill. App. 528.

cord, as a signal to stop; that the car went about a similar distance before it stopped; that he went back to her and with the policeman assisted her. On cross-examination he testified that after she got off he watched her take one or two steps away from the car; that she was clear of the car about three feet; that she had crossed to the middle of the nine feet that is between the step and the curb when he rang the bell. He further testified that after the car had gone ten or twelve feet, the officer told him something and he rang the bell again and stopped the car and looked around and saw her on her hands and knees, her hands resting on the curb; that when he went to her, she said she was not hurt.

One Wojciechowicz, a baker, who was riding on the front platform, testified that he remembered the car starting up again after two men got off and the car starting, and then a bell being given and the car stopped again; that he looked back and saw a woman, about seven feet west from the car, three or four feet from the curb, lying down, and saw the conductor and police officer go to her assistance and help her up. On cross-examination he said that he did not notice particularly just how many feet she was from the car or curb; that it looked to him that she was seven or eight feet from the curb. At the time he saw her he says he was on the front platform and the car was, at the time, clear across the street.

On behalf of the defendants one Dr. Small testified, in answer to a hypothetical question which purported to contain a general statement of the facts which the evidence tended to show, that an oblique inguinal hernia never occurs from one act of violence, and that when any form of hernia occurs from one act of violence the person is incapacitated from moving.

The evidence on behalf of the plaintiff, taken by itself as it appears in the record, is clearly sufficient to sustain the verdict. But upon all the evidence, as

there is an obvious controversy as to the facts, we are asked on behalf of the defendant to hold that the determination of the jury in favor of the plaintiff is clearly against the manifest weight of the evidence, and, of course, to do that without having seen the witnesses or heard them testify. If this cause were being decided for the first time, and its decision were limited to a consideration of the facts as they appear recited in the present record, we might reasonably be persuaded to hold that the plaintiff had not made out her case by a preponderance of the evidence. But such is not the present situation. There has been already an important trial of the case, and as Mr. Justice Mulkey said in *Calvert v. Carpenter*, 96 Ill. 63: "It can scarcely be repeated too often, that the judge and jury who try a case in the court below have vastly superior advantages for the ascertainment of truth and the detection of falsehood over this court (the Supreme Court) sitting as a court of review."

There are not many discrepancies in the testimony. The plaintiff's story is straightforward and consistent. She says she fell because the car started up and while she was alighting. Koslowski agrees with her, save that he states that she took hold of both railings and that her right foot was partly on the ground and in the air when the car moved, whereas she says she had hold of the railing on the body of the car and was in the act of putting her left foot down when the car started.

The cross-examination of Koslowski was very elaborate but his answers suggest very strongly that they were the truth. They were full of details and yet on the whole constitute a reasonably coherent, consistent and plausible statement. According to his testimony he was only about thirty or forty feet away at the time she fell and so had full opportunity to witness exactly what transpired.

Kolin, for the defendants, said that the plaintiff got

off and walked west and after the car had gone a car's length it stopped; that he turned and saw she had fallen down about four feet from the curbstone on her hands and knees. He further said that although he did not see her fall she had walked five or six feet away when the car started and that when he saw her after she had fallen she was on her hands and knees with her hands on the curb. DeCramer says that she got off when the car was standing still and the next thing he knew the conductor stopped the car and when he got off he saw her down on her hands and knees about two feet from the curbstone; that although he says he did not see her fall he saw her walk away from the street car a step or two; he placed the distance from the car to the curb from ten to twelve feet. Shaddon, the conductor, says that she stepped off while the car was standing still and that after she had taken two or three steps from the car he rang the bell to go ahead; that the policeman called his attention to her having fallen; that he then looked and saw her on her hands and knees near the curb, her hands resting on the curb; that after she had gotten off and taken two or three steps from the car he rang the bell to go ahead; that when the car originally started up she was about in the middle of the space between the car step and the curb. Stadfield, the police officer, the only one of defendants' witnesses who testified that he saw her fall, says that the car was standing perfectly still when she stepped off, that she took a couple of steps clear of the car towards the curb, and when the car started she was about three steps away from the car steps; that she fell face forward on all fours; that no other part of her body but the hands and knees touched the ground. He emphasized the fact that she was about three steps away from the car at the time of her fall but seems to figure the distance that she walked as forty-two inches. He also says that her hands were not on the curb. Wojciechowicz, who was

riding on the front platform, stated that after the car stopped the second time, he looked back and saw her about seven feet west of the car, three or four feet from the curb, lying down, although on cross-examination he said it looked to him as though she was about seven or eight feet from the curb.

It will be seen that the witnesses for the defendants do not agree as to the position she was in nor as to just where she was after she had fallen or as to the distance she was away from the step of the car when it started up. It is true that those discrepancies are somewhat slight, yet they exist. It hardly seems reasonable that if she got off the car safely and walked three steps west, as Stadfield says, or five or six feet west, as Kolin says, being a woman of five feet eight inches in stature, and the distance from the step to the curb being only between eight and nine feet, that when she fell she would not fall, quite obviously, on the curb and sidewalk. Stadfield goes so far as to say that not even her hands were on the sidewalk, and the baker, who was on the front platform, says that she was lying down even three or four feet from the curb. And, on cross-examination, says seven or eight feet from the curb. Then, too, there is the testimony of the attending physician who found black and blue spots on her back; and yet Kolin, DeCramer, Stadfield and the conductor all state that when they first saw her she was merely down on her hands and knees. And Stadfield, the police officer, who was the only witness for the defendants who saw her fall, stated that she fell straight forward on her hands and knees and that no other part of her body touched the ground. Of course, if what those witnesses say is true, it is difficult to reconcile it with the injuries to the plaintiff's back. However, we do not consider the discrepancies referred to as of overwhelming importance, but cite them as illustrating the evidentiary controversy that was presented to the jury, and as suggesting the

importance in such a case of seeing the witnesses and hearing them testify in order, chiefly, to pass upon their credibility.

Further, as to the condition of Racine avenue, which at the point in question was a dirt road outside of the car tracks, there is some controversy as to whether it was smooth or rough. The police officer, however, called for the defendants, and who had known the street for over twenty-five years, testified that he did not find any evidence that it was in such a bad condition that the city would be liable if a person fell on it.

The case is a difficult one. However, appreciating the fact that it is our duty, even though the evidence on behalf of the plaintiff is sufficient by itself to make out a case, to set aside the judgment, if we believe it is clearly against the weight of the evidence—*Donelson v. East St. Louis & S. Ry. Co.*, 235 Ill. 625—and that on the crucial issue in the case four witnesses contradict two, which element of numbers, although not controlling, is of some significance—*Hanley v. Chicago City Ry. Co.*, 180 Ill. App. 397—we feel bound, after careful consideration of all the evidence, to conclude that we are not justified in overriding the verdict of the jury.

It is contended on behalf of the defendants that the damages awarded are excessive. We cannot agree with counsel for the defendants that there is no evidence of sufficient probative value to support a legal finding that the oblique inguinal hernia was caused by the fall.

It is further contended that the trial judge erred in giving instruction numbered 8. That instruction is as follows:

"You are instructed that the only care and caution required of the plaintiff was such conduct and care and caution for her own personal safety, in alighting from the car in question as a reasonably prudent and

cautious person would have exercised under the same conditions and circumstances, before and at the time of the alleged injury. She was not required to exercise extraordinary care or diligence.''

It is contended that the words ''in alighting from the car,''· ''under the same conditions and circumstances'' and ''at the time of the alleged injury,'' as they are used in this instruction, constitute an assumption that the plaintiff was injured while alighting from the car. If there is any possible ambiguity in that instruction, which we are inclined to doubt, it was cured by other instructions that were given, such as numbers 21, 22 and 24.

Finding no error in the record the judgment will be affirmed.

*Affirmed.*

O'CONNOR, J., concurs.

MR. PRESIDING JUSTICE THOMSON dissenting: I am unable to concur in the foregoing decision. In my opinion, the verdict and judgment for the plaintiff in this case are clearly against the manifest weight of the evidence. Much is made by counsel for the plaintiff of the bruises which were found on the plaintiff's back, after her fall, on the occasion in question. It is argued that it is quite impossible for her to have received these bruises, if she fell in the manner described by the witnesses for the defendants. In my opinion, it is equally impossible for her to have received these bruises from any fall she may have experienced in the manner described by her own testimony.

It is further argued that cases of this kind cannot be decided simply on the number of witnesses testifying on the one side or the other, and that the weight of the evidence may not be determined by counting the number of witnesses. Certainly not. But it is equally true that the number of witnesses testifying on one side and on the other has something to do with the question of the weight of the evidence, contrary

to the apparent contention of counsel for the plaintiff.

On the facts involved, the only issue presented has to do with the question of whether the plaintiff fell as she was alighting from the defendants' car, or whether her fall occurred after she had left the car entirely. The determination of that question settles the question of liability. On that proposition, it seems to me that the clear preponderance of the testimony is in favor of the defendants. The statute imposes upon this court the duty of passing final judgment on the facts. In fulfilling this duty, necessarily, the court must weigh the evidence. As pointed out by counsel for the defendants, the jury acts upon the mere preponderance of the evidence, while this court acts upon the manifest preponderance of the evidence.

The plaintiff says she fell as she was alighting from the car. In this she is corroborated by one witness. The defendants' contention is that she fell after she had alighted from the car and walked away from it several paces. This theory of the accident is supported by six witnesses.

The one witness corroborating the plaintiff was not in a position to observe the occurrence accurately. The accident occurred at night. From the evidence, it is apparent that the plaintiff's corroborating witness was on the sidewalk and something over 100 feet in a northwesterly direction from the point where the plaintiff got off the car. As she left the car, all the testimony is to the effect that she proceeded in a northwesterly direction toward the entrance to her premises, which was just a few feet away from the point at which the car stopped. In other words, when she stepped off the car, her course took her in a general way towards the spot where this corroborating witness was standing. This witness, therefore, was not in a position to tell accurately at just what point in her course the plaintiff fell. He was in a position to see her go down and tell of her position as she was

in the street after her fall. It is significant, in my judgment, that on that point he corroborates the defendants' witnesses, for he mentions that she fell on her hands and knees.

Four of the defendants' witnesses were in a position enabling them to see accurately just what happened as the plaintiff alighted and to tell whether her fall occurred at that time. These witnesses being the conductor, the policeman, and the other two passengers on the rear platform of the car. They all state positively that she did not fall as she was getting off the car; that she stepped down to the street and left the car entirely and that she had walked away from the car several paces before the car started up. That situation is very accurately corroborated by the motorman and the passenger on the front platform, who testified that two passengers left the car at that end, on the occasion of this stop, and that when the motorman got the bell to go ahead, they had not completely alighted, and the motorman therefore paused, after getting the bell to proceed, and waited until these two front platform passengers were off the car before he went ahead. Comment is made in the majority opinion on the fact that there are some slight discrepancies in the testimony of the defendants' four witnesses who were on the back platform, as to just how far away from the car the plaintiff had gone before she fell. In my opinion, these discrepancies are quite immaterial. If anything, they would seem to lend themselves to the conviction that these witnesses were telling the truth. The important thing about that testimony is the fact that they all agree that there was no fall of any kind as the plaintiff left the car, but that she had gone several steps away from the car, even before the car started.

In my opinion, where the defendants' theory is thus supported by six witnesses, and the plaintiff's is supported by only one in addition to her own testimony,

who was not so located as to observe the occurrence accurately, and at least four of the defendants' witnesses were in a position to see accurately what happened at the crucial point in the occurrence, and their description is so strongly corroborated by other facts described by the other two witnesses, as is the case here, a decision for the plaintiff is clearly against the manifest weight of the evidence. Therefore, I am of the opinion that the judgment of the circuit court should be reversed with a finding of fact.